O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **RONALD R. RUSSELL,**<br><br>     Plaintiff,<br><br>vs.<br><br>**PACIFIC MOTOR TRUCKING COMPANY,**<br><br>     Defendant. | **Case No.: SACV 13-0717-DOC (DTBx)**<br><br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT  [49]** |

Before the Court is Defendant's Motion for Summary Judgment (Dkt. 49). A hearing on this matter was held on December 15, 2014. Upon consideration of the arguments and the briefing, the Court hereby GRANTS the Motion.

## I. INTRODUCTION

This case involves a dispute over Defendant Pacific Motor Trucking Company's ("Defendant" or "PMT") short-lived implementation of an "owner-operator" truck leasing program. Plaintiff, Ronald R. Russell ("Plaintiff" or "Mr. Russell") was a participant in the program. Mr. Russell claims that Defendant induced him into signing on to the program by allegedly representing that it would be a long-term arrangement, a statement that proved false given the program's cancellation in 2009, and that a breach of contract occurred when PMT terminated the program.

Defendant now moves for summary judgment, arguing that even if it had represented that the program would be long-term, there is no evidence that Defendant and its representatives had knowledge of the falsity of that statement. Further, Defendant claims Plaintiff was not entitled to rely on that statement in signing up for the program. Defendant also argues that Plaintiff has waived his claim of fraudulent inducement by performing under the terms of his first lease agreement and subsequently entering into a second lease agreement in 2009. Defendant also maintains that it acted according to the terms of the agreement when it cancelled the lease agreement in 2009.

## II. FACTUAL BACKGROUND

Mr. Russell worked as a car hauler for PMT from 1987 through 2010. Uncontroverted Material Fact ("UMF") 1-2. Consistent with its employment agreements, in 2007 PMT elected for the first time to implement an owner-operator program ("Program"). Before that time, all drivers were company employees driving company tractor trailers. Mr. Russell learned of the Program in late 2006 or early 2007 at an informational meeting. UMF 7. Mr. Randy Beggs ("Mr. Beggs"), PMT's Vice-President at the time, presented at that meeting . He informed the company drivers that PMT would be opening the Program to them if they wished to join. UMF 8. At the meeting, Mr. Russell recalls that Mr. Beggs told him and other drivers that participants in the Program would receive 68% of the revenue from the hauls that were made using the leased equipment. UMF 11. Mr. Russell also recalls that Mr. Beggs mentioned that "it would be beneficial to us…if we would like to be a partner on getting… trucks, becoming an

owner/operator" and that it was "a long time thing." Depo. of Ronald Russell ("Russell Depo.") at 43, 143. Mr. Russell understood this to mean that the program would last forever. *Id.* at 95. Mr. Russell also believes Mr. Beggs made an oral representation at this meeting that PMT would perform maintenance at a reduced rate. *Id.* at 91. Apart from this meeting, Plaintiff had no other discussion with PMT representatives about the Program prior to purchasing a truck in 2007. UMF 13.[1]

Mr. Russell decided to participate in the program. He did not seek out legal or financial advice prior to purchasing a truck, UMF 15-16, nor did PMT advise him to do so. Mr. Russell joined a group of other drivers in purchasing trucks and trailers from West Coast Enterprises to secure group financing. UMF 20. He purchased a Sterling truck ("Sterling Truck"), although PMT did not specify Plaintiff purchase a specific type of truck for use in the Program. UMF 24. Mr. Russell explains that he felt compelled to purchase a Sterling, as the PMT shop would only work on these types of trucks. Russell Depo. at 51-54. At the time he purchased the truck, Mr. Russell had not seen the lease agreement ("2007 Agreement") that would govern his lease under the owner-operator program. UMF 21. Mr. Russell indicates that he was not allowed to see the agreement prior to signing it, as PMT claimed it contained confidential information. Russell Depo. at 61:24-62:1. He signed the agreement around July 3, 2007, directly before retrieving the Sterling Truck he had purchased. UMF 30. The 2007 Agreement had provisions

---

[1] Under Local Rule 56-2, any party who opposes a motion for summary judgment must file a "Statement of Genuine Disputes" in which the party must set forth "all material facts as to which it is contended there exists a genuine dispute." L.R. 56-2. In reviewing the Plaintiff's statement, however, the Court finds the "genuine disputes" are often uncited, unsupported by admissible evidence, or do not contradict the material fact at issue. For example, in this instance Plaintiff cites to meetings that postdate Mr. Russell's purchase of the Sterling Truck – conversations with Mr. McGuire that took place after Mr. Russell purchased his truck in 2007 and 2009 conversations with Mr. Beggs. As such, the Court finds that there is no genuine dispute as to the material fact presented by the Defendant: that Plaintiff had no other discussion with PMT representatives prior to the purchase of the truck. The Court considered each dispute included in the Plaintiff's response, and adopted a fact as undisputed to the extent Plaintiff did not cite to relevant, admissible evidence that contradicted the fact presented.

that provided for cancellation in its first 90 days, and allowed either party to terminate the agreement upon 30 days' notice. UMF 32-33. It did not contain any provisions regarding repairs. UMF 53, 55. After signing the agreement, he immediately began driving for PMT as an owner-operator. UMF 35.

During the course of the 2007 Agreement, Mr. Russell learned that PMT had ceased to provide maintenance to Program trucks at the PMT shop. UMF. 36. He never received any maintenance under the Program. UMF 38. Mr. Russell thus came to believe that certain statements made by Mr. Beggs at the informational meeting were false. UMF 40.

Mr. Russell continued to drive his 2007 Sterling Truck for approximately 18-months, until replacing it with a new, more expensive, vehicle (the "Sleeper Truck Combo") in 2009. UMF 41. Mr. Russell considered this to be an upgrade in quality, and because PMT was not performing maintenance, switching brands was preferable because he could get the truck fixed anywhere. UMF 45, Russell Depo. at 68:2-5. Mr. Russell spoke to Mr. Beggs twice prior to making this purchase. Russell Depo. at 78:16-82:1. Mr. Beggs told him that the new truck would need to be PMT colors with straps, and that PMT would "take care of" the license on the truck. UMF 43; Russell Depo. at 78:20-24. Mr. Russell entered into a subsequent lease agreement with PMT in 2009 when he purchased the Sleeper Truck Combo. UMF 50. Mr. Russell acknowledges that he read through the entirety of the 2007 Lease Agreement during the time he was operating under that agreement, and had knowledge of all the terms of the lease agreement prior to purchasing the 2009 Sleeper Truck Combo and when he entered in to the new lease agreement (the "2009 Agreement"). Plaintiff knew at this time that there was a term in the 2009 Lease agreement that allowed either party to terminate the lease on 30-days' notice. UMF 53. He signed the 2009 Agreement on January 20, 2009. UMF 52. No one from PMT at that time told him how long the lease would last. UMF 51.

Plaintiff claims he would not have joined the Program if he had known its actual duration. UMF 49. Mr. Russell believed the leases would last "forever." Russell Depo. at 95.

On February 16, 2009, PMT issued a thirty day notice to Mr. Russell that it had decided to terminate the 2009 Agreement pursuant to Section 8.01 of the 2009 Agreement. UMF 64.

PMT maintains that the program was canceled upon the severe downturn in the economy, and subsequent drop in business. Accordingly, Mr. Russell's 2009 Agreement ended on March 18, 2009. Mr. Russell had no information about why the Program was cancelled. Mr. Russell subsequently returned to his former role with PMT as a company driver until May 2010. UMF 70. After retiring from PMT, Plaintiff worked for at least two other companies to afford $5,000 per month payments on his Sleeper Truck Combo. UMF 74; Russell Depo. at 70. His truck was eventually repossessed when he was unable to make the payments. Mr. Russell did not personally seek PMT's assistance in selling the truck. UMF 76.

### III.  EVIDENTIARY DISPUTES

In support of his Opposition, Mr. Russell submitted unauthenticated and unmarked excerpts of deposition testimony, sworn statements from Mr. Russell's attorneys and a declaration from Mr. Russell himself. Defendant argues that all of the evidence Plaintiff presented should be disregarded as inadmissible. Reply at 3, Defendant's Objection to and Motion to Strike Plaintiff's Evidence ISO Defendant's Motion for Summary Judgment (Dkt. 62-4).

As to the depositions, the Plaintiff eventually cured the defect, and the Court will consider the record. It is worth noting, however, that in considering the Deposition evidence it will rely exclusively on the text of the deposition, rather than any restatements of the record.[2]

PMT further argues that Mr. Russell's declaration, which apparently directly controverts or significantly supplements Mr. Russell's own deposition testimony, should be disregard as a "sham." Reply at 1-5. Generally, a party should not be able to substitute an affidavit alleging helpful facts for earlier deposition testimony harmful to its case in order to avoid summary judgment. *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir.

---

[2] The Court is concerned about the manner in which Plaintiff cites to the evidence, and the clear mischaracterization of Mr. Russell's own deposition testimony. For example, in response to UMF 61, Plaintiff states that "Mr. Beggs represented the program would last forever." This is clearly contradicted by the cited testimony, which shows that it was Mr. Russell's subjective belief that it would last "forever." There is no evidence to indicate that Mr. Beggs ever made this representation.

1993) (citing *Foster v. Arcata Assocs., Inc.,* 772 F.2d 1453, 1462 (9th Cir.1985); *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir.1975).) However, the Ninth Circuit has held that rule should be applied with caution, and only after the Court makes a finding of fact that the affidavit is a "sham," generated solely in order to create a genuine issue of material fact. *Id.*

Upon reviewing the Plaintiff's deposition and Mr. Russell's declaration, the Court finds that the declaration was manufactured in large part to "create an issue of fact at trial and avoid summary judgment." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). Mr. Russell's new recollections that contradict his previous deposition testimony are unpersuasive. For example, in paragraph 9 of Mr. Russell's declaration, he claims that prior to purchasing his second truck, he spoke to Mr. Beggs who told him that "there was no need to be concerned about any risks, as PMTC had been around for many years and the lease term would be indefinite as long as PMTC remained in business." Decl. of Ronald R. Russell in Opposition to Defendant's Mot. ("Russell Decl.") ¶ 9. At his deposition, however, Mr. Russell testified that Mr. Beggs told Mr. Russell that picking up the new truck was "fine," advised Mr. Russell as to the colors of the truck, told him that it had to be a "strap truck," and that "we'll take care of" the license. Russell Depo. at 74:1-75:4, 78:16-80:17. Mr. Russell represented at that time that this was the extent of the conversation. *Id.* at 78:19-79:4. Thus, the statement that Mr. Beggs told him that "there was no need to be concerned about any risks, …and the lease term would be indefinite as long as PMTC remains in business" directly contradicts Mr. Russell's previous testimony as to his recollection of his meeting with Mr. Beggs prior to purchasing the Sleeper Truck Combo. Although the meetings occurred several years in the past, and Plaintiff claimed at the time of the deposition that he could not recall everything, it does not appear that there is an honest discrepancy, mistake, or new evidence that has generated this inconsistent

1 testimony.[3] *Id.* Therefore, in so far as Mr. Russell's declaration *contradicts* his prior deposition testimony, it will be disregarded. Thus, the Court GRANTS Defendant's evidentiary objections 1-4, 7, 9, and 12. The Court need not address the other objections as the contents were not relevant to the material facts at issue.

**IV.     LEGAL STANDARD**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323.  When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49.  A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248.  A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  Rather, there must be specific,

---

[3] Plaintiff claims that documents "refreshed" Mr. Russell's recollections – but does not provide these documents or described their contents to add context to the new and clearly contradictory information. In light of the absence of any additional documentary materials, the Court cannot assess the merit of whether these materials explain an honest mistake.

admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## V. ANALYSIS

### A. Fraudulent Misrepresentation[4]

Under Missouri law, intentional misrepresentation consists of (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or his or her ignorance of the truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 132 (citing *Larabee v. Eichler*, 271 S.W.3d 542, 546 (Mo. 2008)). A plaintiff's failure to establish any one of the essential elements of fraud is fatal to recovery. *Id.* (citing *Verni v. Cleaveland Chiropractic College*, 212 S.W.3d 150, 154 (Mo. 2007) (en banc).

Plaintiff alleges that PMT made two false statements during the 2006/2007 introductory meeting: (1) that maintenance work on owner-operator trucks would be performed at PMT's shop at reduced rates; and (2) that the Program would be a "long-term" arrangement. Plaintiff presents no additional evidence of specific statements made to the Plaintiff by PMT prior to signing the 2007 Agreement. Defendant maintains that Plaintiff has presented no evidence to suggest that PMT made these misrepresentations knowing of their falsity. Further, Defendant

---

[4] Due to a choice-of-law provision in the parties' contract, the Court has previously determined that this case is governed by Missouri substantive law. Order, February 6, 2014 (Dkt. 28).

-8-

argues that any reliance on these representations was unreasonable. Finally, Defendant argues that even if the representations were fraudulent, Plaintiff has waived any claim for fraud by entering into a subsequent agreement in 2009. The Court agrees with the Defendant.

Long-Term Partnership

The primary statement that Plaintiff allegedly relied on in purchasing his trucks was the statement of Randy Beggs, allegedly made at the 2006/2007 introductory meeting, asserting that the program would be "long-term." Plaintiff has pointed to no evidence of PMT specifically representing to the Plaintiff the duration of the Program, nor did he seek clarification about the length of the program during that meeting or prior to purchasing the truck or signing the lease agreement. Despite the absence of a representation as to a specific or minimum length of time that the Program would last, however, Plaintiff subjectively believed that "the lease [would be] good forever." Russell Depo. at 95.

Defendant claims that Plaintiff has no evidence to prove element (4) above, the speaker's knowledge of the falsity of the statement. Plaintiff argues that that the Defendant must have known the terms of the lease (which it allegedly concealed from him at the time of the purchase of his truck), demonstrating that PMT knew the program would not be long-term because of the presence of the cancellation/termination provisions.

This evidence, however, does not support the proposition that Mr. Beggs or PMT knew that the program would last for under two years at the time of the introductory meeting. Drawing all inferences in the non-movant's favor, the presence of a clause allowing for the cancellation of the lease by either party does not support the conclusion that PMT knew the program was going to end after a short period of time when the introductory meeting took place; it only shows that PMT knew that either party *could* cancel or terminate the lease. Plaintiff's other evidence of alleged non-disclosure or concealment of the contract terms (Opp'n at 15-16 ) is also unconvincing. For example, Defendant's failure to disclose that the program might be terminated when Plaintiff signed his renewed lease agreement in 2009 has no bearing on whether PMT had knowledge that the program would not be long-term when it

made the representation in 2006/2007. Accordingly, the Court finds that the Plaintiff has not presented any admissible evidence as to this element of his claim.

Under an alternate theory, the Plaintiff argues that he and other drivers believed that the representation made by Mr. Beggs regarding the length of the program meant that the program would last "forever," as long as PMT was in business. Thus, Plaintiff argues, the presence of a clause allowing for the cancellation of the lease agreements contradicts Plaintiff's understanding of Mr. Beggs's representation. Opp'n at 15 ("the 'forever' language is not in the contract"). Under Missouri law, "the truth or falsity of representations for purposes of a fraud claim is judged 'in the light of the meaning which the plaintiffs would reasonably attach to them in existing circumstances and the words employed must be considered against the background and in the context in which they were used.'" *Renaissance Leasing*, 322 S.W.3d at 133 (citing *Haberstick v. Gordon A. Gundaker Real Estate Co.,* 921 S.W.2d 104, 109 (Mo.App. 1996)). While the meaning of "long-term" is subject to differing interpretations, be it one year or five, the language simply does not signify an interminable period. Thus, Plaintiff's subjective belief that this meant the 2007 lease agreement would last "forever" is unreasonable as a matter of law in light of the words employed. *Id.* As such, although the presence of a cancellation clause in a lease agreement could draw an inference that PMT knew the lease would not last "forever," it does not support the inference that PMT knew the lease would not be "long-term." Therefore, Plaintiff's theory regarding his subjective belief as to the length of the lease agreement is unavailing.

Defendant cites to evidence demonstrating that PMT wanted the owner-operator program to succeed, and logic dictates as much. Ex. D (Declaration of Randy Beggs) ("Beggs Decl.") at 14:20. It is patently unreasonable for a business to begin a venture which it believes will fail after a short time. Basic logic reinforces PMT's evidence that shows that the downturn in the economy is the reason for the ultimate cancellation of the program in 2009, and that neither Mr. Beggs nor anyone in PMT was aware of the expected duration of the program when it was implemented in 2007.

1 In his briefing, Plaintiff also alludes to the fact that PMT allegedly concealed material
2 information. As a preliminary matter, Plaintiff failed to plead a claim for fraudulent
3 concealment in his Second Amended Complaint. SAC ¶¶ 13-19. Even if the court were to
4 consider this the late-pleaded theory, it would fail regardless. Plaintiff relies on *Hess v. Chase*
5 *Manhattan Bank* to support his position the PMT fraudulently concealed information regarding
6 the length of the lease agreements. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d
7 758, 765 (Mo. 2007). Under Missouri law, "in nondisclosure cases, a party's silence amounts to
8 a representation where the law imposes a duty to speak." *Id.* "Silence can be an act of fraud
9 where matters are not what they appear to be and the true state of affairs is not discoverable by
10 ordinary diligence." *Id.*

11 *Hess* is inapplicable here for several reasons. First, *Hess* involved the sale of real
12 property where the defendant knew at all times that the EPA was investigating the property for
13 contamination, but represented to the Plaintiff that it "had never seen nor occupied the property
14 and that it had not inspected [the] property." *Id.* at 764. Under these circumstances the court
15 found that the defendant had a duty to disclose, where defendant had knowledge of undisclosed
16 material facts that Hess would not have discovered through ordinary diligence. *Id.* As discussed
17 above, Plaintiff has not presented evidence that PMT knew the program would be short lived –
18 nor could it have been aware that Plaintiff was operating under the assumption that the Program
19 would last forever. It is unclear what, then, PMT had an alleged duty to disclose. Outside of the
20 length of the program, Plaintiff has not indicated what material facts PMT fraudulently failed to
21 disclose.

22 Plaintiff explains that he thought that the partnership would be "no-risk" even after
23 reviewing the 2007 Agreement, due to Mr. Beggs's failure to mention that the program could
24 end. Opp'n at 9. In addition, he claims that Mr. Beggs's statement, before signing the 2009
25 Agreement, that "we'll take care of it" is further grounds for believing the program contained
26 no risk and would proceed indefinitely. Neither of these representations is specific enough to
27 justify reliance for entering into a new agreement – at which point Plaintiff had fully reviewed
28 the terms of the lease and knew that the terms contradicted his understanding of the contract.

Moreover, Beggs's statement was made with respect to the licensing of the vehicle, not the duration of the lease.

Plaintiff also argues that, even if Mr. Beggs did not know that his statement regarding a long-term partnership was false, he also did not have the basis to assert the information. Opp'n at 16. Once more, Plaintiff cites to no evidence in his opposition to support this position, or contradict the evidence that Mr. Beggs and PMT believed the company was in a sound financial position when beginning the Program. The record contains undisputed evidence that both PMT and Mr. Beggs believed the company was going to be successful when beginning the Program and had no reason to believe that the financial collapse would cause the Program to end after only a year and a half.

Regarding the argument that Mr. Beggs's statement created a fiduciary relationship between the company and the owner-operators, the Court is not convinced. The evidence presented to the Court does not support the establishment of a relationship of trust and confidence to support existence of a fiduciary relationship. *See, e.g., Western Blue Print Co., LLC. V. Roberts*, 367 S.W.3d 7, 9 (Mo. 2012). Therefore, Plaintiff's expectations that the program would not end prior to the company's dissolution was unfounded.

For the aforementioned reasons, the Court finds that the Plaintiff has not presented evidence to support an essential element of his claim – that PMT knew of the falsity of Mr. Beggs's statement regarding the length of the program at the time it was made. PMT's Motion is GRANTED as to the claim for fraudulent misrepresentation pertaining to the length of the Program.

<u>Maintenance Program</u>

Plaintiff also alleges that PMT falsely represented that drivers would be able to access PMT's shop under the Program, giving them access to discount maintenance services. Although afforded little attention in the briefing, the Court will address this statement independently. Unlike the statements regarding the duration of the program, there is evidence to support the fact that PMT knew that this statement was false when made, given the fact that the

maintenance program was not included in the 2007 Agreement and that the maintenance services were cancelled so soon after the initiation of the Program.

Defendant argues, however, that the Plaintiff has waived his claim for fraud regarding the maintenance program by signing the subsequent 2009 Agreement. Under Missouri law, "the authorities are unanimous in holding that where one has been induced by fraud to enter into a contract and, *after discovery of the fraud,* enters into an agreement concerning the subject matter of the contract, … he is conclusively deemed to have waived any claim for damages on account of fraud." *Peck v. Jadwin*, 704 S.W.2d 708, 711 (Mo. Ct. App. 1986) (citations omitted) (emphasis in the original). "The foregoing rule does not operate unless the defrauded party, at the time of making the second agreement, had knowledge of the fraud which induced his entry into the first agreement." *Id; see also*, *Ainsworth Corp. v. Cenco Inc.*, 107 Ill. App. 3d 435, 440, 437 N.E.2d 817, 821 (1982). Although knowledge of the fraud is typically a question of fact, the undisputed record in this case confirms that the Plaintiff had full knowledge of the alleged fraud and that he voluntarily entered into a subsequent agreement confirming the terms of the lease with PMT.

Plaintiff argues that he did not have knowledge of the fraud at the time of the ratification of the contract in 2009 because Defendant failed to disclose that it was considering cancelling the contract. Opp'n at 20-21. This purported failure to disclose has no bearing on the falsity of Mr. Beggs's 2006/2007 statement which is the basis of the fraud. Plaintiff's argument that he had no knowledge of the falsity of Mr. Beggs's statements is belied by Plaintiff's knowledge of the terms of the contract when he signed the 2009 Agreement. The evidence shows that, in 2009, Plaintiff knew (1) that the maintenance program was cancelled and (2) that the lease agreement for the Program contained a cancellation provision. Thus, Plaintiff had knowledge that even his subjective understanding of Mr. Beggs's representations at the introductory meeting were false at the time that he signed the 2009 Agreement.

Plaintiff further argues that the doctrine of waiver is inapplicable here because the Plaintiff incurred substantial debt as a result of Defendant's misrepresentations, and it would have been impossible for him to rescind the contract. The crux of Plaintiff's argument is that he

had no choice but to purchase the new vehicle in 2009 because of PMT's cancellation of the maintenance program, and the fact that he was firmly committed to the program due to his initial purchase of the truck.

Plaintiff's arguments, though sympathetic, are unavailing. First, he has cited no law to support the fact that the incurrence of a debt upon entering into a contract renders the principal of waiver inapplicable when the party later ratifies the initial contract. Nor does the case law at issue support this position.  In *Brown*, the court considered precisely that issue. The plaintiffs argued that because they had expended $3,476 in entering a lease agreement before the discovery of the fraud, they should not be barred from bringing a fraud case despite the execution of a new agreement ratifying the terms of the original agreement. *Brown v. S. Joplin Lead & Zinc Mining Co.*, 231 Mo. 166, 132 S.W. 693, 695 (1910). The court explicitly rejected this argument. "This doctrine of waiving the right to sue for fraud and deceit by entering into a new agreement concerning the same subject–matter may well be sustained on the theory that all such questions were considered by the parties in making the new agreement." *Id.*

There is also no evidence to support the fact that PMT compelled the Plaintiff to purchase the new truck in 2009. While the Plaintiff believed that the purchase was a sound financial decision, he made that decision knowing the terms of the lease agreement that he was allegedly fraudulently compelled to enter into, including the existence of the clauses allowing for cancellation of the agreement and, more importantly, PMT's cancellation of the maintenance program. The uncontroverted evidence shows that, after the discovery of the lack of the maintenance program and the existence of a cancellation clause, the Plaintiff entered into a subsequent agreement concerning the subject matter of the contract. He ostensibly did so because, under the program, he was earning substantial amounts of money (three times more than as a company driver) and was otherwise satisfied with the Program. In purchasing a second vehicle and signing a new agreement, the Plaintiff waived his claim of fraud in the inducement regarding the maintenance program as to the 2007 Agreement.

1  For this reason PMT's Motion is GRANTED as to the claim for fraudulent

2 misrepresentation pertaining to the maintenance program and the Defendant's Motion for

3 Summary Judgment as to the claim for fraudulent misrepresentation is GRANTED in FULL.

### B. Breach of Contract

On February 6, 2014, the Court held that the only basis on which the Plaintiff could bring a claim for breach of contract was that PMT failed to assist in selling or purchasing Plaintiff's truck. Order at 17. The Court found that PMT's cancellation of the contract was proper pursuant to Section 8.01 of the Lease Agreement. *Id.*

In an attempt to salvage his breach of contract claim, Plaintiff claims there are genuine issues that exist with respect to whether the defendant should be estopped from enforcing the terms of the 2009 Agreement governing the termination (Section 8.01) or cancellation (Section 5.02) of the contract. Plaintiff failed to allege a claim for estoppel in his second amended complaint. The SAC alleges that PMT breached the contract when it failed to assist Plaintiff in selling his truck or purchasing it at fair-market value and by refusing to allow Plaintiff to continue participation in the program, without addressing the estoppel argument. SAC ¶ 20-23. Under Missouri law, estoppel must be pleaded with particularity in the complaint. *E. C. Robinson Lumber Co. v. Lowrey*, 276 S.W.2d 636, 641-42 (Mo. Ct. App. 1955) (estoppel must be pleaded to make evidence offered on that theory admissible); *Grafeman Dairy Co. v. Nw. Bank*, 315 Mo. 849, 859, 288 S.W. 359, 363 (1926) (Not only must the estoppel be pleaded, but this must be done with more certainty than is requisite, or will suffice in ordinary defenses).

The pleading requirements of Rule 8 are in place to provide a party with adequate notice of the allegations against them. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006). A party may not, therefore, allege new claims in his opposition to a summary judgment motion not previously raised in his complaint. *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment). Allowing Plaintiff to plead this theory in opposition to the motion for summary judgment

would cause prejudice to PMT, who has not been afforded sufficient opportunity to discover evidence and respond to these new theories. *McKinney v. Am. Airlines, Inc.,* 641 F. Supp. 2d 962, 982 (C.D. Cal. 2009) ("Unless a plaintiff includes allegations in her complaint or informs the defendant before the close of discovery of her intent to rely on previously undisclosed allegations, she may not assert them for the first time in opposing summary judgment."). For these reasons, the Plaintiff will not now be allowed to introduce an argument for estoppel barring enforcement of Section 5.02 or 8.01.[5]

As the Plaintiff has abandoned his claim for breach based on PMT's alleged failure to assist him in selling his truck (Opp'n at 24), and this Court has previously determined that PMT's cancellation of the agreement was proper pursuant to Section 8.01, there remains no issue of material fact regarding the breach of contract.

Defendant's motion is GRANTED as to the breach of contract claim.

As the Court has dismissed both the fraud and contract claims, there remains no genuine issue of material fact with respect to punitive damages.

**VI.    DISPOSITION**

For the reasons set forth herein, Defendant's Motion for Summary Judgment is GRANTED in full.

---

[5] Furthermore, Plaintiff cites to no Missouri law to support his late-alleged claim for estoppel, citing instead only to three Florida cases. Additionally, the evidentiary records contains no support for the fact that Defendant knew the program was going to end abruptly when Plaintiff signed the 2009 Agreement – therefore, for the same reasons the fraud claim fails, an estoppel claim would also fall short. This Court is not obliged to further consider claims that have not been properly pleaded, confirmed by the evidentiary record, or supported by applicable law in the briefing. In oral arguments, Plaintiff moved for leave to amend under Rule 15. Plaintiff had ample time to amend his pleadings prior to this date, and Defendant would be exposed to substantial prejudice if Plaintiff were allowed to amend at this late date. Moreover, as discussed above, as Plaintiff has presented no admissible evidence that Defendant knew the program was going to end prior to Plaintiff signing the 2009 agreement, or that it made any representations about the length of the 2009 agreement, the estoppel claim would be fruitless. The motion is denied.

1      It is hereby ordered that Plaintiff's claims be dismissed with prejudice.

3      DATED: December 18, 2014

                                                    */s/ David O. Carter*

                                                    DAVID O. CARTER
                                        UNITED STATES DISTRICT JUDGE